*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RUSSELL LOIOLA, a legally incapacitated person, by JEFFREY FRIED, Personal Representative,

Plaintiff-Appellee,

v

CITIZENS INSURANCE COMPANY OF AMERICA,

Defendant,

and

CITIZENS INSURANCE COMPANY OF THE MIDWEST,

Defendant-Appellant.

UNPUBLISHED
August 6, 2020

No. 348670
Washtenaw Circuit Court
LC No. 16-001044-NF

Before: METER, P.J., and BECKERING and O'BRIEN, JJ.

PER CURIAM.

In this no-fault insurance dispute, Jeffrey Fried, acting as a personal representative,[1] filed suit against defendant, Citizens Insurance Company of the Midwest, on behalf of plaintiff, Russell Loiola, seeking benefits under the no-fault insurance act, MCL 500.3101 *et seq.*[2] The matter

---

[1] Fried is identified in the caption as a "personal representative," but according to his trial testimony and the letters of guardianship in the lower court record, he is more accurately described as a guardian.

[2] With the enactment of 2019 PA 21, the Legislature substantially amended portions of the no-fault insurance act effective June 11, 2019. However, because the current case commenced before the effective date of that amendment, this case is controlled by the former provisions of the no-fault act. See *George v Allstate Ins Co*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket

proceeded to a jury trial, and the jury returned a verdict in Loiola's favor in the amount of $353,438.79 plus interest. After trial, the court concluded that Citizens' denial of benefits was unreasonable and awarded Loiola penalty attorney fees under MCL 500.3138. Citizens appeals as of right. For the reasons explained in this opinion, we vacate the judgment in Loiola's favor, we vacate the award of attorney fees and costs, and we remand for a new trial.

## I. BACKGROUND

Loiola was injured in a hit-and-run motor vehicle accident in January 2010. It is undisputed that he suffered a traumatic brain injury, though the degree of the injury and the level of care medically necessary for his injury were matters of debate among experts during trial. Loiola's claim was assigned to Citizens under the Michigan Assigned Claims Plan (MACP).

Following the accident, between 2010 and 2013, Loiola lived with his mother, and it appears that Citizens paid benefits during this time. However, in 2013, Citizens began investigating Loiola's continued claims for benefits and requested an independent medical examination (IME). In the meantime, Loiola's living situation changed. He moved from his mother's home to a facility called Special Tree. In 2014, he moved from Special Tree to another facility called Progressions, where Loiola lived more independently. Finally, and most relevant to this case, in November 2015, he moved to a "semi-independent living" facility called NeuroRestorative. He was still living in this facility during trial. Significant to the issues in this case, the charges while at NeuroRestorative consisted of two categories: (1) per diem charges, relating to things like food and room and board, and (2) additional charges for professional services Loiola received. For a time while Loiola was at NeuroRestorative, Citizens paid for specific therapies, but Citizens never paid the per diem charges, and it later stopped paying for any of NeuroRestorative's services.

In November 2016, Fried, who had been appointed Loiola's guardian in October 2014, filed this suit against Citizens on Loiola's behalf, seeking payment of benefits under the no-fault insurance act. The charges at issue relate to those incurred from November 2015 onward. In particular, Loiola sought a total of $383,255.21 in benefits, which included (1) NeuroRestorative's bills, (2) charges for a "case manager," (3) charges by Fried for acting as Loiola's guardian, and (4) the outstanding balance on a partially unpaid bill for a neuropsychological examination.

Citizens disputed its liability for these charges on several grounds. First, relying on its IMEs and other evidence, Citizens asserted that long-term, semi-independent living at NeuroRestorative was not reasonable and necessary for someone with Loiola's level of injury, particularly years after the accident. Second, also related to the extent of Loiola's injuries and his need for services related to the accident, Citizens asserted that many of Loiola's ongoing complaints—including anxiety, depression, and cognitive difficulties—existed, to some degree, before the accident and that Loiola was exaggerating his post-accident symptoms as evinced by his repeated failures on validity testing during neuropsychological examinations. Third, regardless

---

No. 341876); slip op at 3 n 3. Unless otherwise noted, references to the no-fault insurance act are to the version in effect at the time this action commenced.

of the level of Loiola's injuries, Citizens asserted that there were certain charges by NeuroRestorative that were not compensable under the no-fault insurance act as a matter of law, including a food stipend and wages paid to Loiola. Finally, Citizens maintained that Loiola was disqualified from receiving personal protection insurance (PIP) benefits under MCL 500.3173a(2) because he made, or caused to be made, false statements in support of a claim for benefits under the MACP.

In the trial court, Citizens moved for summary disposition under MCR 2.116(C)(10), and later filed a motion for judgment notwithstanding the verdict (JNOV) or a new trial, regarding those charges that Citizens contended were not compensable as a matter of law. The trial court denied both motions. Citizens also requested special jury instructions on (1) allowable expenses and (2) fraudulent insurance acts under MCL 500.3173a(2). The trial court denied the instructions.

Following trial, the jury returned a verdict in Loiola's favor, awarding $353,438.79 of the $383,255.21 sought. After trial, the trial court also awarded Loiola penalty attorney fees under MCL 500.3138. Citizens now appeals as of right.

## II. ALLOWABLE EXPENSES

On appeal, Citizens first asserts that the trial court erred by denying its motions for summary disposition, JNOV, and a new trial with regard to charges that were not allowable expenses as a matter of law. Citizens contends that (1) a food stipend, (2) wages paid to Loiola by NeuroRestorative, (3) a personal trainer, (4) nonmedical transportation, and (5) room and board, including amenities such as utilities and cable, were not allowable expenses. We conclude that, although the trial court did not err by submitting some of these charges to the jury, the trial court erred by allowing the jury to consider the food stipend, wages, and personal trainer charges, which were not allowable expenses as a matter of law.

## A. STANDARD OF REVIEW

This Court reviews de novo a trial court's grant or denial of summary disposition. *Sisk-Rathburn v Farm Bureau Gen Ins Co of Mich*, 279 Mich App 425, 426-427; 760 NW2d 878 (2008). "When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all the evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact." *Id*. at 427. This Court also reviews de novo a trial court's decision on a motion for JNOV. *Coble v Green*, 271 Mich App 382, 389; 722 NW2d 898 (2006). "In reviewing a trial court's denial of a defendant's motion for JNOV, this Court should examine the testimony and all legitimate inferences therefrom in the light most favorable to the plaintiff. A trial court should grant a motion for JNOV only when there was insufficient evidence presented to create an issue for the jury." *Attard v Citizens Ins Co of America*, 237 Mich App 311, 321; 602 NW2d 633 (1999). In comparison, a trial court's denial of a motion for a new trial is reviewed for an abuse of discretion. *Coble*, 271 Mich App at 389. To the extent this case requires interpretation of the no-fault insurance act, our review is de novo. *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588, 594; 648 NW2d 591 (2002).

## B. LEGAL PRINCIPLES

At issue in this case is Loiola's request for allowable expenses. A claimant seeking "allowable expenses" under the no-fault act must satisfy the requirements of two statutes: MCL 500.3105(1) and MCL 500.3107(1)(a). See *Griffith ex rel Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 530; 697 NW2d 895 (2005).

Under the first statute, MCL 500.3105(1), an insurer is liable to pay "benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle . . . ." MCL 500.3105(1). As interpreted by our Supreme Court, this statute mandates that "a no-fault insurer is liable to pay benefits only to the extent that the claimed benefits are *causally connected* to the accidental bodily injury arising out of an automobile accident." *Griffith*, 472 Mich at 531 (emphasis added).

The second statute, MCL 500.3107(1)(a), provides that PIP benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." To constitute an allowable expense, the "care" provided—like "recovery" and "rehabilitation" services—must be "necessitated by the injury sustained in the motor vehicle accident." *Id*. at 534-535. In contrast, an "ordinary, everyday product, service, or accommodation is not compensable under MCL 500.3107(1)(a) because that expense cannot be for the claimant's care, recovery, or rehabilitation." *Admire v Auto-Owners Ins Co*, 494 Mich 10, 26-27; 831 NW2d 849 (2013). Whether a product or service is reasonably necessary for care, recovery, or rehabilitation under MCL 500.3107(1)(a) must be determined from an objective prospective. *Krohn v Home-Owners Ins Co*, 490 Mich 145, 160; 802 NW2d 281 (2011). Each particular expense must be both reasonable and necessary. *Nasser v Auto Club Ins Ass'n*, 435 Mich 33, 50; 457 NW2d 637 (1990).

Our Supreme Court applied the requirements of MCL 500.3105(1) and MCL 500.3107(1)(a) in *Griffith* and held that an injured person living at home was not entitled to payment of his ordinary, everyday food expenses. First addressing MCL 500.3105(1), the Court explained that the food expenses were not "for accidental bodily injury"—meaning that the expenses were not causally related to the insured's (Griffith's) injury—because it was not claimed that Griffith's "diet [was] different from that of an uninjured person, that his food expenses [were] part of his treatment plan, or that these costs [were] related in any way to his injuries." *Griffith*, 472 Mich at 531.

The *Griffith* Court went on to explain that even if MCL 500.3105(1) were satisfied, Griffith's food expenses still were not compensable under MCL 500.3107(1)(a). It stated:

> Griffith's food costs here are not related to his "care, recovery, or rehabilitation." There has been no evidence introduced that he now requires different food than he did before sustaining his injuries as part of his treatment plan. While such expenses are no doubt necessary for his *survival*, they are not necessary for his recovery or rehabilitation from the injuries suffered in the accident, nor are they necessary for his care because of the injuries he sustained in the accident. Unlike prescription medications or nursing care, the food that Griffith consumes is simply an ordinary means of sustenance rather than a treatment for his "care,

recovery, or rehabilitation." In fact, if Griffith had never sustained, or were to fully recover from, his injuries, his dietary needs would be no different than they are now. We conclude, therefore, that his food costs are completely unrelated to his "care, recovery, or rehabilitation" and are not "allowable expenses" under MCL 500.3107(1)(a). [*Griffith*, 472 Mich at 535-536.]

Although *Griffith* dealt specifically with costs for food, its reasoning applies to any ordinary expenses that are "the same for an injured and an uninjured person," such as transportation, clothing, toiletries, and housing. See *Admire*, 494 Mich at 31; *Griffith*, 472 Mich at 538-539.

The *Griffith* Court, however, did not rule that PIP benefits for items such as food or housing are categorically non-compensable. As explained by our Supreme Court in *Admire*, for any expense to be compensable, it must represent more than "[a] mere change in the injured person's postaccident expenses," and instead "the new expense must be of a wholly different essential character than expenses borne by the person before the accident to show that it is *for* the injured person's care, recovery, or rehabilitation." *Admire*, 494 Mich at 27. If an expense is new in its essential character, then "it is *fully* compensable." *Id*. at 28.

The *Admire* Court recognized that applying this rule to "[s]pecial accommodations or modifications to an ordinary item present[s] a particular challenge." *Id*. at 28. Our Supreme Court explained that, in such a situation, the special accommodation or modification is always compensable, but whether the ordinary item itself is compensable depends on whether the accommodation or modification "can be separated easily, both conceptually and physically, so that the fact-finder can identify which costs are of a new character and are thus for the injured person's care, recovery, or rehabilitation and which costs are ordinary, everyday expenses that are unchanged after the accident." *Id*. More fully, the Supreme Court explained this as a distinction between a "combined" product or accommodation and an "integrated" product or accommodation:

A "combined" product or accommodation results from an ordinary expense, unchanged as a result of the injury, being joined with an accommodation or product that is actually for the injured person's care, recovery, or rehabilitation. An "integrated" product or accommodation involves the blending of an ordinary expense with one that is for the injured person's care, recovery, or rehabilitation in a way that the resulting product or accommodation cannot be separated easily into unit costs. Unlike an integrated product or accommodation, a combined product or accommodation can be separated easily, both conceptually and physically, so that the fact-finder can identify which costs are of a new character and are thus for the injured person's care, recovery, or rehabilitation and which costs are ordinary, everyday expenses that are unchanged after the accident. As this Court suggested in *Griffith*, MCL 500.3107(1)(a) requires the insurer to cover a truly integrated product or accommodation in full because the entire expense, including the portions that might otherwise be considered ordinary, is necessary for the injured person's care, recovery, or rehabilitation. But because a combined product or accommodation can be easily separated into components related to the injured person's care, recovery, or rehabilitation and components unrelated to that care, recovery, or rehabilitation, only the related expenses are actually compensable. MCL 500.3107(1)(a) mandates this result because, when the product or

accommodation can be easily separated into an ordinary expense and an expense for care, recovery, or rehabilitation, requiring the insurer to pay for the ordinary expenses would destroy the cost-containment aspect of the no-fault insurance act, something of which this Court has long been mindful. [*Id*. at 28-29.]

With this distinction between a combined versus integrated expense in mind, the *Admire* Court concluded that a modified van constituted a "combined" expense because the base cost for the van was an ordinary transportation expense ("the essential character of [the] plaintiff's preinjury need for transportation has not changed") that could be easily separated from the compensable accommodation (the cost of the necessary modifications to the van). *Id*. at 31-32. On this basis, the *Admire* Court held that the insurer was liable for the modifications to the van but not for the base cost of the van. *Id*. at 31-34. In contrast to these "combined" transportation-related charges, the *Admire* Court offered custom shoes as an example of an "integrated" product, explaining: "When a medical products company produces a custom shoe, the shoe is an integrated product because the medical nature of the shoe, which is for the injured person's care, recovery, or rehabilitation, cannot be separated from the ordinary need for shoes by an uninjured person. Thus, the entire cost of the shoe is an allowable expense." *Id*. at 30.

Also, and particularly relevant to the current case, both *Griffith* and *Admire* identified hospital charges—encompassing things like housing and food—as an example of "integrated" products and accommodations. In *Griffith*, when concluding that the injured party living at home could not recover ordinary food examples, the Supreme Court contrasted his situation with that of someone living in a hospital, explaining:

> Food costs in an institutional setting are "benefits for accidental bodily injury" and are "reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." That is, it is "reasonably necessary" for an insured to consume hospital food during in-patient treatment given the limited dining options available. Although an injured person would need to consume food regardless of his injuries, he would not need to eat *that particular food* or bear the cost associated with it. Thus, hospital food is analogous to a type of special diet or select diet necessary for an injured person's recovery. Because an insured in an institutional setting is required to eat "hospital food," such food costs are necessary for an insured's "care, recovery, or rehabilitation" while in such a setting. Once an injured person leaves the institutional setting, however, he may resume eating a normal diet just as he would have had he not suffered any injury and is no longer required to bear the costs of hospital food, which are part of the unqualified unit cost of hospital treatment. [*Griffith*, 472 Mich at 537-538.]

Citing to *Griffith*, the *Admire* Court elaborated on the integrated nature of hospital charges:

> In its discussion of insurance coverage for hospital food during the insured's hospital stay, the *Griffith* Court stated that compensation was required because the insured was required to eat "*that particular food*." This is an example of an integrated accommodation. The food, clothing, shelter, and any other ordinary products that are provided by the hospital as part and parcel of the hospital stay are not easily separated from the products, services, and accommodations provided by

the hospital for the injured person's care. Thus, the statute requires the insurer to pay the entire cost. [*Admire*, 494 Mich at 29-30.]

## C. ANALYSIS

In the present case, Loiola is not a patient in a hospital, nor does he reside at home. He lives in a semi-independent living facility that affords considerably greater freedom and choice—like choice of food—than someone in a hospital would enjoy, but also receives supervision that he would not otherwise receive living independently. In this semi-independent living context, Citizens challenges all or part of the per diem changes as being not reasonably necessary for Loiola's care, rehabilitation, and recovery. Citizens' argument has merit in part, and the trial court erred as a matter of law by submitting certain costs to the jury that were not compensable as a matter of law. We conclude that these errors, combined with the errors in jury instructions discussed in the next section, necessarily warrant a new trial.

## 1. FOOD COSTS

We begin by addressing Citizens' challenge to Loiola's food stipend, and we agree with Citizens that it was not compensable as a matter of law.

Each week, NeuroRestorative gives Loiola $75 and takes him to the grocery store, where he purchases the food he wants to eat that week. Loiola can also use that money to eat at restaurants, if he so chooses. There is no evidence that Loiola has a special diet or that the food he eats has curative properties. Thus, as in *Griffith*, Loiola's food costs are not compensable under MCL 500.3107(1)(a) because "[t]here has been no evidence introduced that he now requires different food than he did before sustaining his injuries as part of his treatment plan." *Griffith*, 472 Mich at 535-536. Loiola's food costs represent "[a]n ordinary, everyday expense," which "simply cannot have the object or purpose of effectuating an *injured person's* care, recovery, or rehabilitation because it is incurred by *everyone* whether injured or not." *Admire*, 494 Mich at 26. Because the food that Loiola consumes is not related to his injuries, it is not reasonably necessary for his care, rehabilitation, and recovery, and so his $75 food stipend is not compensable under MCL 500.3107(1)(a).

In contrast to this conclusion, Loiola and the trial court justified the food stipend on two bases: (1) shopping was part of his treatment because he needed to be taught how to shop and (2) the stipend formed part of the per diem, which was essentially a unit cost for NeuroRestorative. Both these assertions lack merit. As to the first basis, the cost at issue is *the cost of Loiola's food*, not the assistance that he received buying that food. To any extent that the services provided by NeuroRestorative to assist Loiola in buying food and the food that Loiola bought could be considered a singular "accommodation," it is clearly a "combined accommodation"—the $75 stipend provided to Loiola "can be separated easily, both conceptually and physically," from the services rendered to help him shop. *Id.* at 28. That is, a factfinder can easily "identify which costs are of a new character and are thus for the injured person's care, recovery, or rehabilitation"—the shopping assistance that Loiola received—"and which costs are ordinary, everyday expenses that are unchanged after the accident"—Loiola's food costs. *Id.* Simply stated, Citizens might be

-7-

liable for the separate cost of paying someone to reteach Loiola to shop, but Citizens is not responsible for Loiola's ordinary, everyday grocery bill.[3]

As for the second basis, the trial court appeared to view the per diem charge as a singular, indivisible charge. In other words, the trial court seemed to view NeuroRestorative as an institution akin to a hospital that could charge for food within its unit price. But this idea that NeuroRestorative's "per diem" charge was unassailable has no basis in *Griffith* or *Admire*. To the contrary, *Admire* unequivocally held that when

> a combined product or accommodation can be *easily separated* into components related to the injured person's care, recovery, or rehabilitation and components unrelated to that care, recovery, or rehabilitation, *only the related expenses are actually compensable*. MCL 500.3107(1)(a) mandates this result because, when the product or accommodation can be *easily separated into an ordinary expense* and an expense for care, recovery, or rehabilitation, requiring the insurer to pay for the ordinary expenses would destroy the cost-containment aspect of the no-fault insurance act, something of which this Court has long been mindful. [*Admire*, 494 Mich at 28-29 (emphasis added).]

The $75 per week food stipend is easily identifiable as a noncompensable, ordinary expense, and it is easily severed conceptually from the rest of the per diem. Further, contrary to the trial court's reasoning, although Loiola is not living at home, he is also not in the in-patient hospital setting described in *Griffith* and *Admire* as examples of integrated charges. In recognizing that food and other everyday expenses may be compensable during a hospital stay, *Griffith* and *Admire* both expressly contemplated situations in which a hospital patient was "required to eat *that particular food*." *Admire*, 494 Mich at 29-30; *Griffith*, 472 Mich at 537-538. Indeed, both Courts considered hospital food akin to a special diet. *Admire*, 494 Mich at 32; *Griffith*, 472 Mich at 537. Loiola, in comparison, was not required to eat any particular food. He enjoys considerable freedom in his semi-independent living facility, including the ability to leave, go to the store, and purchase normal food which he then prepared in his apartment. He was also free to go to restaurants and has in fact used the food stipend for restaurants. Quite simply, Loiola is not eating "hospital food," and his everyday food expenses—in the form of a $75 per week food stipend—are not compensable.[4] See

---

[3] At trial, there was also evidence that Loiola used the stipend to purchase cat food and cleaning products, items which NeuroRestorative asserted that it did not include in its bills to Citizens. To the extent there was a factual question regarding how the food stipend was used, cat food and cleaning products are also not compensable under the no-fault insurance act.

[4] As a comparison, in addition to food, *Griffith* indicated that, while in the hospital, a patient may also recover benefits for things like clothing and toiletries that are provided by the hospital and included in the hospital's unit price. See *Griffith*, 472 Mich at 539. If NeuroRestorative is going to be characterized as a "hospital" with a single unit charge, should Citizens also have to pay for Loiola's wardrobe and toiletries because he would receive such items at a hospital? Just as *Griffith* rejected such a possibility for a person living at home, the idea that Loiola should receive a stipend for wardrobe and toiletries is nonsensical, and indeed Loiola has not sought such benefits. But

-8-

*Admire*, 494 Mich at 27-30; *Griffith*, 472 Mich at 535-538. The trial court erred as a matter of law by submitting the food stipend charges to the jury and denying Citizens' motion for JNOV on this basis.

## 2. PERSONAL TRAINER

Citizens also specifically challenges charges for a personal trainer. The personal trainer was a specific hourly charge of $145 per hour; it is not a charge included in the per diem. Notably, the personal trainer is simply for exercise; Loiola does not receive physical therapy or physical rehabilitation. Although we do not hold that a personal trainer is per se not an allowable expense under the no-fault insurance act, on the basis of the evidence presented in this case, the trial court erred by denying JNOV with regard to this expense. As with his dietary needs, Loiola needed basic exercise both before and after the accident, and there was no evidence offered to establish how his basic fitness needs changed as a result of the accident. That is, there was no evidence that Loiola's need for exercise after his accident was "new in its essential character," so there was no evidence that the exercise was "actually *for* the injured person's care, recovery, or rehabilitation." *Admire*, 494 Mich at 27. On this record, while basic exercise may be beneficial for Loiola (just as it would have been before the accident), it is not necessary for his recovery or rehabilitation from the injuries suffered in the accident, and it was not necessary for his care because of the injuries he sustained in the accident. See *Griffith*, 472 Mich at 535-536. Because there was no evidence that Loiola's basic fitness needs changed as a result of the accident, a personal trainer is completely unrelated to his "care, recovery, or rehabilitation" and it is not an "allowable expense" under MCL 500.3107(1)(a). See *Griffith*, 472 Mich at 535-536.

More generally, the inclusion of the personal trainer expense in its bills to Citizens evinces NeuroRestorative's blanket approach to both services and charges. In the trial court, particularly in responding to Citizens' motion for summary disposition, Loiola's attorney seemed to take the position that any service NeuroRestorative provided was compensable because Loiola had been "institutionalized." As discussed, this comparison to a hospital or other facility where patients have no control over things like food does not necessarily hold true of the semi-independent living at NeuroRestorative, where residents enjoy considerable freedom and choice. Indeed, at trial, Susan Krygier, NeuroRestorative's representative, denied that NeuroRestorative was an "institution." But, with regard to a personal trainer and other itemized charges (such as charges for smoking cessation services), this "institutional" approach to billing is particularly unavailing. The personal trainer is not included in the per diem; it is a separate, hourly charge, so it is not a combined expense, and it is certainly not an integrated charge. See *Admire*, 494 Mich at 28-29. In these circumstances, Loiola cannot justify the personal trainer expense simply by offering evidence that he needs to live in a semi-independent living facility. Instead, Loiola bore the burden of proving that "each particular expense" was both reasonable and necessary. See *Nasser*, 435 Mich at 50. Given Loiola's failure to offer any evidence of a change to his basic fitness needs,

---

this comparison underscores the fact that the semi-independent living offered by NeuroRestorative is not the same as a hospital. Given the distinctions between a hospital stay and semi-independent housing, NeuroRestorative cannot claim that all the same services a hospital provides are also reasonably necessary, without question, for all its semi-independent residents.

Loiola did not meet his burden of proving that the particular charge for a personal trainer was reasonably necessary. The trial court erred by denying Citizens' motion for JNOV regarding this expense.

## 3. WAGES

Next, Citizens challenges whether the trial court erred as a matter of law by allowing the jury to consider the wages paid to Loiola by NeuroRestorative during prevocational rehabilitation, which were included as part of the per diem NeuroRestorative charged Citizens. We again conclude that the trial court erred by allowing these charges to be submitted to the jury as part of the per diem.

Under MCL 500.3107(1)(a), "expenses for 'recovery' or 'rehabilitation' are costs expended in order to bring an insured to a condition of health or ability sufficient to resume his preinjury life." *Griffith*, 472 Mich at 534-535. Rehabilitation may include vocational rehabilitation, i.e., education, training, and therapy to restore a person to useful and constructive activity. *Maxwell v Citizens Ins Co of America*, 245 Mich App 477, 482-486; 628 NW2d 95 (2001). See also *Bailey v Detroit Auto Inter-Ins Exch*, 143 Mich App 223, 227; 371 NW2d 917 (1985). However, the services encompassed by vocational rehabilitation are *only* those needed to restore a person to the ability to "perform useful and meaningful work and earn a living by it." *Maxwell*, 245 Mich App at 487. Services for vocational rehabilitation—as well as care and recovery—do not encompass payments for assistance or transportation once the injured person has returned to work. *Id*. at 486-487 & n 1. In other words, employment is the *goal* of rehabilitation; employment is not itself rehabilitation.

NeuroRestorative provided Loiola with prevocational training, which included training and education on things like punctuality, appearance, and following directions. On a showing that such services were reasonably necessary for Loiola's rehabilitation, this vocational rehabilitation is generally compensable under the no-fault insurance act. However, NeuroRestorative did not simply provide therapy and training to rehabilitate Loiola; NeuroRestorative also paid Loiola a wage for janitorial work at NeuroRestorative. Payment of these wages is clearly not an allowable expense under the no-fault insurance act. To the extent the wages signal a return to work, the wages are not compensable because a return to work is the goal of rehabilitation, not part of rehabilitation. Further, although the wages paid to Loiola were considered part of the comprehensive per diem charged to Citizens, the wages were easily identifiable and easily separated conceptually from the other costs for NeuroRestorative's services; Citizens had the receipts of the wages paid to Loiola, and that amount could be readily subtracted from the amount NeuroRestorative charged Citizens. Because the wages were noncompensable under the no-fault act and could be readily separated from the per diem both literally and conceptually, the trial court erred as a matter of law by allowing NeuroRestorative to include the wages as part of the per diem it charged Citizens. See *Admire*, 494 Mich at 27-30.[5]

---

[5] Alternatively, if the wage does not evince a return to work, Loiola is essentially being paid to participate in therapy; but the no-fault insurance act makes no provision to pay injured persons a

## 4. NONMEDICAL TRANSPORTATION

Citizens next challenges whether the trial court erred by failing to recognize that nonmedical transportation is not an allowable expense under MCL 500.3107(1)(a). We agree with Citizens that nonmedical transportation is clearly not an allowable expense, but conclude that the trial court did not err by allowing this cost to be included in the per diem charges submitted to the jury.

Generally, under the no-fault insurance act, medical transportation for things such as doctors' appointments is an allowable expense, while nonmedical transportation, including transportation to maintain "preinjury quality of life," is not an allowable expense. *ZCD Transp, Inc v State Farm Mut Auto Ins Co*, 299 Mich App 336, 342-343; 830 NW2d 428 (2012). As explained by the Michigan Supreme Court, medically necessary transportation constitutes an allowable expense because such "transportation needs represent a change in character from plaintiff's preinjury requirements because the trips would not have been necessary in a life unmarred by injury." *Admire*, 494 Mich at 32. In contrast, a general need for transportation that does not change as a result of the accident is not an allowable expense. *Id*. at 32-33.

Loiola received transportation services from NeuroRestorative for both medical purposes and nonmedical services, such as visiting his mother and other personal activities. Under *Admire* and *ZCD Transp, Inc*, the nonmedical transportation services provided by NeuroRestorative do not constitute an allowable expense. In the context of discussing *hospitals* (which again, NeuroRestorative is not), *Admire* and *Griffith* identified everyday items like food, clothing, toiletries, and shelter as things that are "part and parcel" of a hospital stay that cannot be easily separated from products and services provided by the hospital for the injured person's care. See *Admire*, 494 Mich at 29; *Griffith*, 472 Mich at 538. Transportation is not included in either *Admire* or *Griffith* as something that is "part and parcel" of institutional care, and for good reason: transportation is conceptually and physically distinct from the basic shelter, food, and clothing items that are part of a *stay* at an institution. See *Admire*, 494 Mich at 28-29. In other words, no one would suggest that it is "part and parcel" of hospital treatment to receive transportation to run personal errands or to visit friends. Transportation is conceptually distinct from the room-and-board-related expenses inherent in hospital care, and nothing in *Admire* or *Griffith* supports the conclusion that an insurer must pay for all of a person's transportation expenses—medical and nonmedical—simply because he or she lives in an institutional setting. Instead, under *Admire* and *ZCD Transp, Inc*, only medically necessary transportation expenses are allowable expenses.

Though nonmedical transportation is not an allowable expense, it was included as part of the per diem. Unlike with Loiola's food stipend or wages which can be easily identified and separated conceptually from the per diem charged by NeuroRestorative, the cost of Loiola's nonmedical transportation cannot—nothing in the record shows the separable cost of

---

wage to participate in rehabilitation. Instead, wages are compensable under the no-fault insurance act, if at all, only as work-loss benefits. See MCL 500.3107(1)(b); *Griffith*, 472 Mich at 540. In trying to seek payment for wages paid to him by NeuroRestorative, Loiola is essentially seeking wage-loss benefits to which he is not entitled. See *Griffith*, 472 Mich at 540.

NeuroRestorative's nonmedical transportation. That is, a fact-finder could not identify which costs included in the $225 per diem were for allowable expenses, and which were for the ordinary, everyday expense of nonmedical transportation. See *Admire*, 494 Mich at 28. And if that is the case, a fact-finder could not say whether excluding the nonmedical transportation cost would reduce the per diem by $5 or $50. We therefore conclude that the nonmedical transportation cost included as part of the per diem more closely resembles that of an "integrated" accommodation, in that the accommodation "cannot be separated easily into unit costs." *Id*. Because the nonmedical transportation was "integrated" with the per diem cost, the trial court did not err by allowing this cost to proceed to the jury.

## 5. HOUSING

Citizens lastly challenges the trial court's decision to allow the jury to consider NeuroRestorative's general housing-related expenses reflected in the per diem charge, and we conclude that the trial court did not err. As noted, under *Griffith* and *Admire*, ordinary, everyday expenses are not compensable unless the new expense is of a "wholly different essential character than expenses borne by the person before the accident." *Admire*, 494 Mich at 27. The essential character of the expenses associated with NeuroRestorative is semi-independent living in which Loiola receives a certain amount of supervision, including nursing care and other safety measures. Though there were questions of fact regarding whether Loiola needed the level of care afforded in a semi-independent living environment, semi-independent housing is nonetheless of a "wholly different essential character" than living independently without any supervision, as Loiola claimed he had before the accident.[6] *Id*. Moreover, under *Admire*, the fact that Loiola would have needed housing regardless of his injury does not preclude charges for NeuroRestorative's housing expenses because the essential character of the semi-independent housing is "wholly different" than independent living. See *id*. at 28 (explaining that "if a product, service, or accommodation satisfies the statutory criteria, it is *fully* compensable").

Recognizing that the essential character of NeuroRestorative's service is semi-independent living, it follows that expenses that are "part and parcel" of housing, such as utilities or cable, are integrated costs that cannot be isolated from the overall housing-related charges. See *id*. at 29; *Griffith*, 472 Mich at 537. That is, to receive the supervised, semi-independent living offered by NeuroRestorative, Loiola has no choice but to live in one of NeuroRestorative's apartments, and part and parcel of the apartment provided are the included amenities such as utilities and cable. Like a hospital patient forced to eat hospital food and to sleep in a hospital room in order to receive hospital care, Loiola has no choice but to accept the apartment as is, including utilities and cable, in order to receive the supervision and care offered by semi-independent living. See *Griffith*, 472 Mich at 537. Although it is true that he would need housing regardless of his injuries, he would not need the particular apartment, and he would not have to bear the particular expenses of the apartment, at NeuroRestorative. See *id*. Because housing of an essentially different character—

---

[6] Whether Loiola lived completely independently before the accident was a disputed factual question at trial. But even if he lived with his mother before the accident, there was no evidence that she provided supervision or care for Loiola *before* the accident. This need for semi-independent or semi-supervised living is thus wholly different than his pre-accident life.

-12-

and the integrated expenses such as cable and utilities—may constitute allowable expenses, and because there were questions of fact whether Loiola needed this level of care, the trial court did not err by denying summary disposition and JNOV on this basis.

To summarize, the trial court erred by allowing the jury to consider charges that were not allowable expenses as a matter of law, including a food stipend, wages paid to Loiola by NeuroRestorative, and charges for a personal trainer. Given the jury's lump sum verdict, which was less than the full amount requested by Loiola, we cannot determine whether the jury awarded expenses that are not compensable as a matter of law nor can we determine the jury's assessment of the reasonable value of any particular charge.[7] In these circumstances, when the only issues were whether Loiola incurred allowable expenses and the amount of those expenses, the inability to determine how the jury arrived at its award necessitates vacating the jury's verdict and remanding for a new trial, particularly when coupled with the jury instruction errors discussed below. On remand, the trial court shall not allow the jury to consider the charges that were not allowable expenses as a matter of law.

## III. JURY INSTRUCTIONS

Next, Citizens argues that the trial court erred by denying its requests for special jury instructions regarding (1) allowable expenses and (2) fraudulent insurance acts. We largely agree with Citizens, and conclude that these instructional errors, combined with the legal errors discussed in the previous section, warrant a new trial.

## A. STANDARD OF REVIEW

We review a claim of instructional error de novo. *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 694; 630 NW2d 356 (2001). However, determinations regarding whether a particular instruction applies are reviewed for an abuse of discretion. *Id*.; *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 451; 750 NW2d 615 (2008). "Instructional error warrants reversal if the error resulted in such unfair prejudice to the complaining party that the failure to vacate the jury verdict would be inconsistent with substantial justice." *Cox ex rel Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1, 8; 651 NW2d 356 (2002) (quotation marks and citation omitted).

## B. ANALYSIS

Jury instructions "should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). When requested, a standard jury instruction must be given, provided that "if it is applicable and accurately states the law." *Chastain v Gen Motors Corp*, 254 Mich App 576, 590; 657 NW2d 804 (2002). "When the standard jury instructions do

---

[7] In particular, the verdict form asked the jury whether allowable expenses were incurred by or on behalf of plaintiff, and the jury answered "yes." The jury then specified the amount of allowable expenses as $353,438.79. However, the verdict form was not specific as to what constituted allowable expenses, and there is no indication how the jury arrived at its particular figure.

not adequately cover an area, the trial court is obligated to give additional instructions when requested, if the supplemental instructions properly inform the jury of the applicable law and are supported by the evidence." *Bouverette v Westinghouse Elec Corp*, 245 Mich App 391, 401-402; 628 NW2d 86 (2001). "Supplemental instructions, when given, must be modeled as nearly as practicable after the style of the Standard Jury Instructions and must be concise, understandable, conversational, unslanted, and nonargumentative." *Id*. at 402. See also MCR 2.512(D)(4).

"Supplemental instructions need not be given if they would add nothing to an otherwise balanced and fair jury charge nor enhance the ability of the jury to decide the case intelligently, fairly, and impartially." *Central Cartage Co v Fewless*, 232 Mich App 517, 528; 591 NW2d 422 (1998). Ultimately, jury instructions must be viewed in their entirety rather than "extracted piecemeal to establish error." *Case*, 463 Mich at 6. See also *Bouverette*, 245 Mich App at 403. "Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury." *Case*, 463 Mich at 6.

## 1. ALLOWABLE-EXPENSES INSTRUCTION

Before trial, Citizens filed a motion in limine seeking special jury instructions on allowable expenses, particularly relating to (1) everyday expenses, such as food, and room and board, and (2) vocational rehabilitation. With regard to everyday expenses, relying on *Griffith*, Citizens asked the trial court to instruct the jury:

> Food, room and board and other ordinary or everyday expenses of daily living are not recoverable under the Michigan No-Fault Act unless they are directly related to a person's care, recovery or rehabilitation from an injury caused by an automobile accident.

Regarding vocational rehabilitation, Citizens requested the following instruction:

> Vocational Rehabilitation may be recoverable as an allowable expense under the Michigan No-Fault benefit, but only to the extent that it is aimed at restoring an injured person to the working condition he was in before sustaining his injuries.

> An actual return to work is not compensable as Vocational Rehabilitation.

The trial court denied the request for these special instructions, and ultimately only read the model jury instruction on allowable expenses, M Civ JI 35.01, instructing the jury:

> We have a state law known as the no-fault—excuse me no-fault automobile insurance law which provides that if a person sustains accidental bodily injury or death arising out of the operation of a motor vehicle, as a motor vehicle, by himself, an insurance company may be responsible to pay the following types of benefits: The first type of benefit is known as allowable expenses and consists of all reasonable charges incurred for reasonably necessary products, services, and

-14-

accommodations for an injured persons care, recovery or rehabilitation. Allowable expenses include but are not limited to medical expenses.

With respect to the instruction about everyday expenses, we first note that based on our legal conclusions in Part II, the cost of Loiola's food should not have been submitted to the jury because it was noncompensable as a matter of law. Yet the larger idea behind that requested instruction—that ordinary, everyday expenses are not compensable—may still be relevant with respect to other submitted costs. Addressing that issue, we agree with the trial court that Citizens' requested instruction was not appropriate. As noted by the trial court, *Griffith* expressly permits compensation for everyday expenses in an "institutional setting," see *Griffith*, 472 Mich at 537-539, and the parties disputed whether NeuroRestorative was an institutional setting. As discussed in Part II, while NeuroRestorative allows more freedom than a hospital, it is distinct from independent living at home, so certain everyday expenses (like room and board) may be compensable. Thus, Citizens' proposed instruction as applicable to this case is not an "unslanted" recitation of the "applicable law," *Bouverette*, 245 Mich App at 401-402, because it omits that everyday expenses can be compensable in an institutional setting.

Further, the instruction as given by the trial court still allowed Citizens to argue one of their defenses: that Loiola did not need NeuroRestorative and that he was essentially living there to receive free room and board. The instruction given provides that an allowable expense "consists of all reasonable charges incurred for reasonably necessary products, services, and accommodations for an injured persons care, recovery or rehabilitation." This instruction left the door open for Citizens to argue that Loiola's living at NeuroRestorative was not necessary for his care following his injury, and that he was merely living there to receive free room and board. In this respect, even if the instruction given by the trial court was imperfect, it did not deprive Citizens of a defense, and "on balance, the theories of the parties and the applicable law [were] adequately and fairly presented to the jury." *Case*, 463 Mich at 6.[8]

Turning to the requested vocational-rehabilitation instruction, we note that given some of our legal conclusions in Part II, Loiola's wages paid to him by NeuroRestorative as part of his vocational rehabilitation should not have been submitted to the jury. Nonetheless, we believe that the instruction should have still been given in light of other vocational-rehabilitation charges that Citizens was asked to pay. The evidence showed that Loiola received "prevocational rehabilitation" at NeuroRestorative and that NeuroRestorative also charged for what it characterized as "vocational rehabilitation" while Loiola actually worked at stores such as Kroger and Marshalls. Loiola was paid for his work at both Kroger and Marshalls. While working at Marshalls, Loiola had a "shadow" of some sort from NeuroRestorative, but there was no testimony about what this person did that would constitute "vocational rehabilitation" as opposed to mere assistance for someone who is actually working. See *Maxwell*, 245 Mich App at 486-487. Given this evidence, Citizens asserted that Loiola had returned to work and that he was no longer entitled

---

[8] Citizens did not request an instruction specifically addressing nonmedical transportation being an allowable expense, so we do not address whether a supplemental instruction on that issue would have been appropriate. As proposed, we do not believe that the requested instruction about everyday expenses would have sufficiently brought that issue before the jury.

to vocational rehabilitation benefits. On the facts of this case, given the ample evidence that Loiola had returned to work, the trial court abused its discretion by denying a special instruction on vocational rehabilitation, in keeping with *Maxwell*, that was legally accurate and would have been incredibly useful to the jury's determination whether Loiola was entitled to benefits for vocational rehabilitation. The standard jury instruction given by the trial court did not adequately address Citizens' arguments in light of the facts of this case, and failure to give the instruction denied Citizens a strong defense to the vocational rehabilitation charges.

By refusing to give this accurate, properly requested, and helpful special jury instruction on allowable expenses, the trial court failed to adequately and fairly present the theories of the parties and the applicable law to the jury. See *Case*, 463 Mich at 6. Given that what constituted an allowable expense was the central issue at trial, and in light of the inadequate instructions given to the jury to assess what constituted an allowable expense as well as the other errors noted throughout this opinion, it would be inconsistent with substantial justice to allow the jury's verdict to stand. See *Cox*, 467 Mich at 8.

## 2. FRAUD INSTRUCTION

Before trial, Citizens also request an instruction on fraudulent insurance acts under MCL 500.3173a(2). The statute states:

> A person who presents or causes to be presented an oral or written statement, including computer-generated information, as part of or in support of a claim to the Michigan automobile insurance placement facility for payment or another benefit knowing that the statement contains false information concerning a fact or thing material to the claim commits a fraudulent insurance act under section 4503 that is subject to the penalties imposed under section 4511. A claim that contains or is supported by a fraudulent insurance act as described in this subsection is ineligible for payment or benefits under the assigned claims plan. [MCL 500.3173a(2).]

This Court has explained the application of MCL 500.3173a(2) as follows:

> a person commits a fraudulent insurance act under this statute when (1) the person presents or causes to be presented an oral or written statement, (2) the statement is part of or in support of a claim for no-fault benefits, and (3) the claim for benefits was submitted to the MAIPF. Further, (4) the person must have known that the statement contained false information, and (5) the statement concerned a fact or thing material to the claim. [*Candler v Farm Bureau Mut Ins Co of Mich*, 321 Mich App 772, 779-780; 910 NW2d 666 (2017).]

In general, "[a] statement is material if it is reasonably relevant to the insurer's investigation of a claim." *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420, 425; 864 NW2d 609 (2014). "Importantly, MCL 500.3173a(2) does not require that any particular recipient have received the false statement in order for the act to qualify as a fraudulent insurance act, as long as the statement was used as part of or in support of a claim to the [MAIPF]." *Candler*, 321 Mich App at 780 (quotation marks and citation omitted). "Generally, whether an insured has committed fraud is a

question of fact for a jury to determine." *Meemic Ins Co v Fortson*, 324 Mich App 467, 473; 922 NW2d 154 (2018).

In seeking an instruction regarding fraudulent insurance acts, Citizens asked the trial court to read the statutory language from MCL 500.3173a(2) and to provide the following additional explanation:

> If you determine that Plaintiff presented or caused to be presented any oral or written statement that contains false information concerning a fact or thing material to the claim, Plaintiff's claim is not eligible for payment or benefits under the assigned claims plan.

In support of its assertion that an instruction on MCL 500.3173a(2) was warranted, before trial, Citizens maintained that Loiola engaged in fraudulent insurance acts by (1) requesting a food stipend that was not used solely for food and (2) being dishonest with doctors about his medical and substance-abuse history. During trial, Citizens also asserted that the instruction was warranted because Loiola was dishonest about his "baseline" when speaking with doctors. In arguing for the applicability of the instruction, Citizens also asserted that Loiola lied during trial by testifying inconsistently with his claim for benefits insofar as Loiola testified that he worked full-time before the accident and he asserted that he lived independently rather than with his mother.

Before trial, the trial court indicated that a fraud instruction might be appropriate, depending on the facts. However, the trial court also specified that if the facts at trial did not support a fraud instruction, one would not be given. The applicability of the fraud instruction was argued by the parties during trial, and the trial court ultimately declined to give the instruction, reasoning that Loiola's claims about working under the table and living with his girlfriend rather than his mother did not rise to the level of fraud. The trial court did not address Citizens' assertion that providing false information to doctors in support of a claim constituted fraud under MCL 500.3173a(2).

On the facts of this case, the trial court abused its discretion by concluding that the fraud instruction was not applicable.[9] Briefly stated, in concluding that there was no fraud, the trial court

---

[9] On appeal, Loiola argues that Citizens failed to plead fraud in their complaint, and that even if they pleaded that defense, they failed to plead it with particularity. Loiola raised these arguments below, but the trial court declined to address them.

First addressing whether Citizens pleaded fraud in their answer, they clearly did. Citizens' answer stated, "Under MCL 500.3173a(2) and the Michigan Assigned Claims Plan, Plaintiffs [sic] is ineligible for any benefits through the Michigan Assigned Claims Plan if Plaintiff has made or caused to be made false statements during the course of their claim for Plaintiff's benefits regarding the alleged accident," and, "Should it be determined that Plaintiff's claim is supported by fraudulent information, the entire claim is ineligible for benefits."

Turning to Loiola's claim that Citizens' failed to plead fraud with particularity, he relies on MCR 2.112(B)(1), which states, "In allegations of fraud or mistake, the circumstances

erred by ignoring evidence of the falsity of Loiola's statements. The evidence of fraudulent insurance acts may not have been overwhelming, but it was for the jury to decide whether MCL 500.3173a(2) precluded Loiola's claims for PIP benefits.

Specifically, there was evidence that Loiola was not truthful with doctors about his substance abuse and mental health problems before the accident. Dr. Robin Hanks, for example, testified that Loiola *denied* any previous mental health or substance-abuse issues despite the fact that his medical records showed a history of anxiety and depression, suicidal ideation, and substance abuse, including alcohol dependence, cocaine use, abuse of prescription medications, and narcotics withdrawal.[10] Dr. Maury Ellenberg also testified that Loiola "denied" alcohol and drug abuse during their first meeting. There was also testimony that Loiola was dishonest about his academic record when speaking with doctors insofar as, for example, he told Dr. Hanks that he received mostly C's in school when his academic records showed that he had a 1.25 GPA in high school and that he failed a number of classes, both in high school and at Henry Ford Community College. Clearly, the information was false, and the jury could determine whether Loiola knew it to be false.

Regarding whether this false information was material, as explained by experts at trial, Loiola's history was relevant to determining his pre-accident functioning, and it was significant in

---

constituting fraud or mistake must be stated with particularity." Yet Loiola has failed to cite any precedent indicating that the pleading requirement set forth by MCR 2.112(B)(1) is applicable to affirmative defenses in the first instance. Generally, that rule "applies only to the original *pleadings* opening a case," *Williams v Williams*, 214 Mich App 391, 395; 542 NW2d 892 (1995) (emphasis added), and affirmative defenses do not qualify as "pleadings" under our court rules, MCR 2.110(A); *McCracken v City of Detroit*, 291 Mich App 522, 527; 806 NW2d 337 (2011).

[10] Loiola claims that Dr. Hanks "recanted" this statement on cross-examination based on the following:

> *Q*. You just said several times that there was a diagnosis of depression. Would you show that to me?
>
> *A*. Sure.
>
> *Q*. And we're talking about before the accident?
>
> *A*. Right. I'm sorry, he reported depression. He was given a diagnosis of alcohol dependence and cocaine use.

At best, the statement is unclear whether Dr. Hanks meant that Loiola reported to her that he had depression before the accident or that "he reported depression" to other doctors before the accident leading to the "diagnosis of depression" before the accident. At any rate, we do not read this as a recantation of Dr. Hanks' testimony that Loiola denied the other mental health and substance-abuse issues.

establishing a "baseline" for Loiola in order to determine the effects of the accident. Use of cocaine, for example, can have long-term effects on the brain, including cognitive problems, and there was testimony that Loiola's IQ scores after the accident were consistent with someone with a history of poor academic performance. Further, among Loiola's complaints after the accident were anxiety and depression, conditions which he had, at least to some degree, before the accident. In this context, information about Loiola's baseline before the accident could be considered material to evaluating Loiola's claims, and the fact that Loiola denied past problems or provided false information about his history could support a finding of fraud under MCL 500.3173a(2).[11]

Although there was evidence to support Citizens' request for an instruction under MCL 500.3173a(2), not all of Citizens' arguments regarding the fraud instruction have merit. In particular, Citizens also asserts that a fraud instruction was warranted because (1) Loiola sought payment for a food stipend, (2) he sought payment for prevocational programming that was in actuality a job at NeuroRestorative, (3) false statements were made that Loiola could not drive despite the report of an occupational therapist who concluded that Loiola could drive, and (4) Loiola asserted at trial that he worked full-time but in documents provided to Citizens he claimed that he only worked 11 hours a week.

Regarding the food stipend and Loiola's wages from NeuroRestorative, as discussed earlier, these items are not compensable as a matter of law. But Citizens fails to explain how seeking these benefits constitutes the presentation of "false information" in support of a claim. In other words, as long as Loiola provided correct information, Citizens can evaluate and reject these claims as a matter of law; it does not follow that rejection of these claims evinces fraud under MCL 500.3173a(2).[12]

---

[11] Loiola argues that even if he provided false information to doctors about his history, the false statements were "wholly innocuous" because Loiola "provided the records regarding his past drug use" to Citizens, and Citizens made those records available to doctors. However, Loiola does not explain how this excludes the application of MCL 500.3173a(2). It seems as though Loiola is contending that MCL 500.3173a(2) is inapplicable because the doctors could easily discover that he gave them false statements because the doctors only needed to compare Loiola's statements to his records to see that they were false. We fail to see how the language of MCL 500.3173a(2) can lead to such a conclusion.

[12] On appeal, Citizens also notes that Fried sought payment of bills for appointments that he attended with Dr. Jay Meythaler and Loiola. Fried stated that the appointments with Dr. Meythaler were in August and September 2016, but Dr. Meythaler last saw Loiola in April 2016. Although discussed at trial, this issue was not raised in support of Citizens' request for a fraud instruction, and this unpreserved argument does not warrant relief on appeal. Although it appears to be false information to suggest that Fried and Loiola saw Dr. Meythaler in August or September 2016, this appears to be a representation made by Fried, not Loiola, and there is no evidence to suggest that Loiola *caused* Fried to present this false information. See MCL 500.3173a(2). The jury instruction sought by Citizens under MCL 500.3173a(2) would have disqualified *Loiola* from any benefits, but this penalty is inapplicable absent evidence that Loiola "present[ed] or caus[ed] to be presented

Regarding whether Loiola could drive, MCL 500.3173a(2) involves "false information concerning a fact or thing material to the claim." There is evidence that Loiola returned to daytime driving in 2012 and that an occupational therapist cleared him for this daytime driving; there is also no indication that this information was withheld from Citizens or that Loiola lied about the results of his occupational driving test. Instead, Citizens maintains that because Loiola drove in 2012 he must still be able to drive and any claim to the contrary must be false. But the evidence indicated that, after he returned to daytime driving, Loiola was involved in another accident, and after this second accident, he again stopped driving. Further, there was evidence that Loiola reported dizziness, vision issues, and uncertainty while driving in 2013. Given the second accident and Loiola's complaints in 2013, opinions could differ as to whether Loiola could actually drive. In these circumstances, whether Loiola could drive was a matter of opinion and not demonstrably "false information" that would support a claim of fraud under MCL 500.3173a(2).

Lastly, with respect to Citizens' claim that Loiola lied about how many hours he worked in forms submitted to Citizens because his trial testimony differed from the statements made on those forms, this Court in *Haydaw v Farm Bureau*, ___ Mich App ___; ___ NW2d ___ (2020) (Docket No. 345516); slip op at pp 5-6, recently held that nothing discovered after the insurer stopped paying benefits and the insured sued can be used to support a fraud defense because, by that time, the insurer has denied the insured's claim and the parties are now adversaries in litigation. While we question whether *Haydaw* can be applied to claims in this case because that case dealt with a fraud exclusion in a policy and Loiola's claim arises under the MACP, see *Candler*, 321 Mich App at 780 n 6 (explaining that a case arising out of a fraud exclusion in an insurance contract "is not relevant" to a case arising under the MACP), we need not decide that issue today because the parties have not briefed the issue and its resolution is ultimately irrelevant to our disposition of this case given our determination that Citizens was entitled to the fraud instruction based on Loiola's false statements to doctors about his substance abuse and mental health problems before the accident.[13]

In sum, the trial court abused its discretion by denying an instruction on fraud given evidence that Loiola submitted false information in support of his claims by misrepresenting his mental health, substance abuse, and academic record when speaking with doctors. This evidence was material to establishing Loiola's "baseline" for purposes of investigating his injuries and his need for treatment. By failing to give this instruction despite evidence of fraudulent insurance acts, the trial court denied Citizens a defense to Loiola's claims for benefits. On this record, particularly when coupled with the other errors in this case, it would be inconsistent with substantial justice to allow the jury verdict to stand. See *Cox*, 467 Mich at 8.

---

an oral or written statement . . . knowing that the statement contains false information." Accordingly, Fried's potentially false claim regarding visits with Dr. Meythaler did not warrant this instruction with regard to Loiola.

[13] We note that even if *Haydaw* can apply to claims under the MACP, it is nevertheless inapplicable to Citizens' fraud defense related to Loiola's statements to Dr. Hank and Dr. Ellenberg. Those statements were made prior to the start of litigation, and indeed before Loiola began treatment at NeuroRestorative.

IV. ATTORNEY FEES

Finally, Citizens asserts that the trial court erred by awarding attorney fees to Loiola given the factual disputes and legitimate questions of statutory interpretation in this case. We agree.

A. STANDARD OF REVIEW

The no-fault act provides for attorney fees when an insurance carrier unreasonably withholds benefits. The trial court's decision about whether the insurer acted reasonably involves a mixed question of law and fact. What constitutes reasonableness is a question of law, but whether the defendant's denial of benefits is reasonable under the particular facts of the case is a question of fact.

Whereas questions of law are reviewed de novo, a trial court's findings of fact are reviewed for clear error. A decision is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made. [*Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008) (quotation marks and citation omitted).]

B. ANALYSIS

The trial court awarded attorney fees under MCL 500.3148(1), which states:

[A]n attorney is entitled to a reasonable fee for advising and representing a claimant in an action for personal or property protection insurance benefits that are overdue. The attorney's fee is a charge against the insurer in addition to the benefits recovered, if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment.

Under this provision, "[w]hen an insurer refuses to make or delays in making a no-fault payment, a rebuttable presumption arises that this refusal to pay or delay in paying is unreasonable." *Ivezaj v Auto Club*, 275 Mich App 349, 353; 737 NW2d 807 (2007). The burden is then on the insurer to justify its refusal or delay. *Ross*, 481 Mich at 11. "The insurer can meet this burden by showing that the refusal or delay is the product of a legitimate question of statutory construction, constitutional law, or factual uncertainty." *Id.* "[W]hen considering whether attorney fees are warranted under the no-fault act, the inquiry is not whether coverage is ultimately determined to exist, but whether the insurer's initial refusal to pay was reasonable." *Shanafelt v Allstate Ins Co*, 217 Mich App 625, 635; 552 NW2d 671 (1996). In other words, "the court must examine the circumstances as they existed at the time the insurer made the decision, and decide whether that decision was reasonable at that time." *Brown v Home-Owners Ins Co*, 298 Mich App 678, 691; 828 NW2d 400 (2012). "[A]n insurer's initial refusal to pay no-fault benefits can be deemed reasonable even if it is later determined that the insurer was required to pay those benefits." *Moore v Secura Ins*, 482 Mich 507, 526; 759 NW2d 833 (2008).

In concluding that attorney fees were appropriate under MCL 500.3138, the trial court reasoned:

The arguments that were made at trial were largely focused on two issues. One was the insurer's disagreement, I would call it disagreement with the concept of a per diem for the care of Mr. Loiola and Defendant was hyper focused on pulling apart, what was provided by way of the per diem, rather than addressing whether the per diem itself was a reasonable amount and was it necessary for Mr. Loiola. But to focus on what NeuroRestorative chose to do with the per diem that it demanded was, in my view, reasonable.

The second argument that prevailed, second Defense argument that prevailed at trial, and by prevailed I don't mean won, but that was pervasive was that Mr. Loiola had committed fraud in his Application for Benefits, and the jury rejected that. I rejected well—, the jury didn't have a line item for it, but did not determine that the benefits were unreasonable. I don't believe that there was fraud committed by Mr. Loiola in pursuing benefits. The fraud defense has grown from something that probably should apply when someone says they were in an accident and they weren't in an accident, or claims, claims payment for care that was never rendered, and now is opened or is on the verge of being opened or advanced to be open for anyone who doesn't give a complete history to his doctor or who claims that care was provided on Tuesday when it was provided on Wednesday, or misses something in making an application without the intent to defraud the insurance company or to obtain benefits to which the person wasn't otherwise entitled. And I didn't see anything in this case that indicated to me that Mr. Loiola, or anyone on his behalf, was fraudulently billing the insurance company or advancing a claim that didn't have merit. And again, the jury did not find that Mr. Loiola was advancing a claim that didn't have merit.

Briefly stated, the trial court appeared to conclude that Citizens acted unreasonably by denying benefits because (1) Citizens could not "pull apart" the per diem and (2) Loiola did not commit a fraudulent insurance act as evinced by the fact that the jury "did not find that Mr. Loiola was advancing a claim that didn't have merit." There are several significant flaws in this reasoning.

First, as discussed earlier, the trial court erred as a matter of law by concluding that Citizens could not challenge the combined charges rolled into the per diem; for example, the food stipend and wages that NeuroRestorative paid Loiola were not compensable as a matter of law. Second, setting aside the trial court's erroneous view of the per diem, the trial court erred by failing to recognize that whether the per diem could be "pulled apart" presented a legitimate question of statutory interpretation regarding what constitutes an allowable expense. That is, under *Griffith* and *Admire*, Citizens clearly had, at the very least, a legitimate statutory basis for arguing that the per diem could be challenged as a combined charge, which included noncompensable items such as a food stipend and wages for Loiola. Attorney fees under MCL 500.3148 are not appropriate given this legitimate question of statutory interpretation. See *Ross*, 481 Mich at 11.

Further, notably missing from the trial court's analysis is any mention of the conflicting medical opinions that drove this case. No fewer than eight doctors examined Loiola, and the conflicting opinions of these medical professionals were presented to the jury over multiple days of trial. These conflicting opinions evinced significant factual disputes regarding (1) the degree

of Loiola's traumatic brain injury, (2) the implications of his pre-accident problems including his preexisting mental health and substance-abuse issues, (3) the extent to which he had recovered following the accident, and (4) ultimately whether the level of care provided by NeuroRestorative was reasonably necessary for Loiola's rehabilitation, recovery, and care.

Presented with conflicting medical opinions, Citizens relied on the opinions of the IMEs. Considering the circumstances as they existed when Citizens denied coverage for NeuroRestorative, see *Brown*, 298 Mich App at 691, this decision to rely on the IMEs was not unreasonable on the facts of this case. See *Moore*, 482 Mich at 523 (rejecting assertion that a "defendant insurer must 'go beyond' defendant's doctor or IME"). Three of the IME doctors (Dr. Ellenberg, Dr. Hanks, and Dr. Saul Foreman), who concluded that Loiola did not need long-term residential or semi-independent care, offered their opinions to Citizens before Loiola's admission to NeuroRestorative. And the two additional opinions that Citizens later sought (Dr. Brian Roth and Dr. Christian Schutte) bolstered these conclusions. Although Loiola had doctors who opined that he needed NeuroRestorative, Citizens had no obligation to ignore the opinions of the IMEs. See *id*. Indeed, it was particularly reasonable for Citizens to rely on the IME opinions in this case given (1) the consistent validity concerns in Loiola's neuropsychological testing, (2) Loiola's failure to provide his doctors with a full and accurate history,[14] and (3) the fact that even his own doctors believed that he was exaggerating at least some of his symptoms.[15] That Loiola previously lived more independently (at, for example, Progressions) provided further support for Citizens' conclusion that he did not need NeuroRestorative's more intensive level of care. Overall, given the dispute among the experts and the other circumstances of this case, Citizens acted reasonably by denying benefits in reliance on the opinions of its IMEs and the evidence supporting those opinions. See *id*.

Yet the trial court ignored the conflicts in the evidence and simply concluded that Citizens acted unreasonably because Loiola did not commit fraud and the jury found his claims meritorious. The conclusion that Loiola did not commit a fraudulent insurance act is dubious given that this question was not submitted to the jury. More generally, that the jury ruled in Loiola's favor is not dispositive of the question whether Citizens' initial refusal to pay was unreasonable. See *id*. at 526. By ignoring the factual dispute surrounding the contested expenses and concluding that the refusal to pay was unreasonable because the jury awarded the claimed expenses, the trial court clearly erred. See *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 171; 761 NW2d 784 (2008).

---

[14] As noted, Loiola was not forthcoming with the IME doctors. In addition, Dr. Charles Seigerman, who was not an IME doctor, was initially unaware that Loiola had a history of cocaine and marijuana use as well as anxiety and depression.

[15] Dr. Seigerman, for example, testified that Loiola's testing suggested that he was exaggerating and overreporting his symptoms. Dr. Meythaler likewise testified that there was evidence that Loiola exaggerated, at least with regard to "side issues." Although these doctors did not believe these concerns invalidated all the testing results, the fact remains that Loiola consistently failed validity testing, which provided sound reason for questioning the results of his tests and his self-reported complaints.

-23-

On the whole, this case involved legitimate questions of statutory interpretation and significant factual disputes regarding Citizens' liability for benefits.  On this record, the trial court erred as a matter of law by awarding attorney fees to Loiola.  The award of attorney fees is vacated.

Vacated and remanded for a new trial.  We do not retain jurisdiction.


/s/ Patrick M. Meter
/s/ Colleen A. O'Brien